**TWIN ISLAND DEVELOPMENT
CORPORATION**

v.

**Catherine WINCHESTER.**

Supreme Judicial Court of Maine.

Argued March 12, 1986.

Decided July 3, 1986.

320

Mittel & Hefferan, E. Paul Eggert (orally), Robert E. Mittel, Portland, for plaintiff.

David A. Ross (orally), Washington, D.C., for intervening defendant.

Ayer & Hodsdon, Gordon C. Ayer, Kennebunk, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

After a jury trial in York County, the Superior Court entered judgment against defendant Catherine Winchester adjudging that plaintiff Twin Island Development Corporation (Twin Island) was entitled to a mechanic's lien for a specified amount against certain land in Kennebunkport, and awarding Twin Island contract damages against defendant personally in the same amount as the mechanic's lien. Catherine Winchester appeals from both parts of the judgment. As to the first part, we conclude that defendant fails to identify any fatal defect in the complaint by which Twin Island commenced its action to enforce a mechanic's lien for work it performed in constructing roads on the Kennebunkport land. As to the second part of the judgment, we reject both of defendant's contentions (1) that the presiding justice's charge to the jury contained reversible error and (2) that the jury's finding that she had vested her husband with apparent authority to contract for her was not adequately supported in the evidence. We therefore affirm the judgment of the Superior Court in all respects.

*Background*

On May 3, 1980, Catherine Winchester and her husband, Hugh Winchester, contracted to purchase from John Fulton a farm located on Guinea Road in Kennebunkport (hereinafter referred to as the "Winchester property" or the "farm"). The Winchesters took immediate possession under a lease arrangement. On June

9, 1980, Fulton as seller and Catherine Winchester as sole purchaser executed a bond for a deed for the farm. Two days before, on June 7, Twin Island, a close corporation owned and operated solely by George Garnache, had begun construction of a road on the farm pursuant to an oral agreement with Hugh Winchester. As the job progressed through the summer of 1980, the Winchesters expanded the project to include construction of a horse training track. By July Garnache had discussed the nature and scope of his work with both Fulton and Catherine Winchester. Fulton, who had not been paid according to the terms of the bond for a deed, expressed concern to Garnache about the Winchesters' solvency. Although Catherine Winchester spent some time that summer in England, she was present at the premises during part of the time the construction work was going on, and she expressed directly to Garnache criticism of the quality and timeliness of Twin Island's work. She had plans for making a living by raising and training horses on the farm. On August 26, 1980, Twin Island, not having been paid in full, stopped work on the Winchester property. On September 22, 1980, Twin Island filed in the York County Registry of Deeds a statement of lien claim against the farm.

On November 25, 1980, Twin Island commenced the present action against Catherine Winchester and her husband, Hugh, by filing a complaint seeking to enforce a mechanic's lien against the Winchester property for labor performed and materials furnished "in improving the land" thereof.[1] In March 1984 the Superior Court permitted plaintiff Twin Island to amend its complaint to add a second count seeking contract damages against Catherine and Hugh Winchester for the same labor and materials. The court entered a default against

Hugh Winchester for failure to respond to discovery requests. Both the lien claim (count 1) and the contract claim (count 2) against Catherine Winchester were tried to a jury on June 12–14, 1985.[2] The jury, in a special verdict, found, *inter alia*, that Twin Island had "suppl[ied] material and perform[ed] labor in the construction of [roads] on the Winchester property," that Twin Island was entitled to $41,029 "for the work performed on the Winchester property," that both John Fulton and Catherine Winchester had given consent to plaintiff Twin Island for the work, and that Hugh Winchester had apparent authority to make a contract with Twin Island on behalf of his wife, Catherine. After giving credit for $13,673.10 previously paid to Twin Island for the work, the Superior Court on August 6, 1985, entered the following judgment:

It is ORDERED and ADJUDGED that the plaintiff is entitled to a mechanic's lien in the amount of $27,355.90, plus interest and costs against the subject property and a judgment in the amount of $27,355.90, plus interest and costs against the defendants Catherine Winchester and Hugh Winchester.[3]

### I. *Mechanic's Lien Claim*

■ Defendant Catherine Winchester attempts to defeat the mechanic's lien asserted against her property on the ground that the complaint by which Twin Island commenced the action to enforce the lien did not describe the work done with adequate specificity. Defendant concedes that for the purposes of the lien statute she was the owner of the property, at least after June 9, 1980, when she became the purchaser of the farm under a bond for a deed, and she continued as such throughout the period Twin Island worked on her property.[4] By

1. Also named as a defendant was John Fulton. *See* n. 3 below.

2. The trial, at which Hugh Winchester did not appear, also determined the amount of the default judgment to be entered against him following his default.

3. The judgment also dismissed the action as to defendant John Fulton. *See* n. 1 above.

4. Although the work commenced on June 7, 1980, two days before the execution of the bond for a deed, Catherine Winchester was, even at that time, in possession of the farm under a

special verdict the jury specifically found that Twin Island supplied materials and performed labor in the construction of roads on the Winchester property, and that defendant's husband had apparent authority to contract for her for that road construction and that she also consented to it. Accordingly, pursuant to 10 M.R.S.A. § 3501 (1980),[5] since Twin Island did that road work both "by virtue of a contract with [and] by consent of the owner," it automatically had a statutory "lien on the lot of land over which such road ... is laid out or constructed." In the language of *Shaw v. Young*, 87 Me. 271, 274, 32 A. 897, 898 (1895), "it is clear that the lien has been honestly earned [by Twin Island], and [that Twin Island as] the lien claimant is within the statute," section 3501.

By the terms of section 3501, which created it, Twin Island's lien might be "enforced in the same manner and under the same restrictions as liens on buildings and lots" under 10 M.R.S.A. §§ 3251–3269 (1980 & Supp.1985). Since it furnished the labor and materials by a contract with the owner of the property affected, Twin Island did not have to file a lien claim in the registry of deeds as otherwise required by 10 M.R.S.A. § 3253, in order to avoid its lien being dissolved.[6] Instead, to enforce its lien, it needed only to commence a lien enforcement action within 120 days after the last of the labor or materials was furnished,[7] 10 M.R.S.A. § 3255(1), by filing a complaint satisfying the pleading requirements of 10 M.R.S.A. § 3257.[8] Applying the section 3257 pleading requirements (for building liens) to the section 3501 road construction lien *mutatis mutandis*, it is argued that technically Twin Island's complaint should have alleged that it furnished labor and materials "in the laying out or construction of ... road[s], path[s] or walk[s]." Instead, its complaint read in

---

lease and a contract binding her to purchase the farm. We find nothing in *Lyon v. Dunn*, 402 A.2d 461 (Me.1979), that requires us to disregard the beneficial ownership interest that Catherine Winchester held in the subject property throughout the time the work was being performed. *See Toler v. Satterthwaite*, 200 Kan. 103, 434 P.2d 814, 819–20 (1967).

5. 10 M.R.S.A. § 3501 provides:

Whoever performs labor or services or furnishes labor, materials or services in the laying out or construction of any road, path or walk, or in improving or beautifying any land in a manner commonly known as landscape gardening, by virtue of a contract with or by consent of the owner, has a lien on the lot of land over which such road, path or walk is laid out or constructed or on the land so improved and beautified, to secure payment thereof, with costs. Such lien may be preserved and enforced *in the same manner and under the same restrictions* as liens on buildings and lots are preserved and enforced under chapter 603 [10 M.R.S.A. §§ 3251–3269], and is made subject to all the provisions of said chapter, wherever applicable.
(Emphasis added)

6. In fact, Twin Island did make a timely filing of a lien claim in the York County Registry of Deeds, presumably to protect itself from any uncertainty as to ownership of the farm and from the vagaries of proving apparent authority. *See* part II(A)(1) of this opinion.

7. Defendant also contends that the complaint is fatally defective because it fails to allege expressly that it was filed within 120 days of performance of the last lienable work. That argument is without merit. Although a mechanics' lien complaint must be filed within 120 days, 10 M.R.S.A. § 3255(1) (Supp.1985), nothing in the mechanic's lien statutes requires such an explicit allegation to be pleaded. The complaint, which was filed on November 25, 1980, recited that the last labor and materials were furnished on August 26, 1980, and therefore shows on its face that it was filed within the 120-day period.

8. 10 M.R.S.A. § 3257 (Supp.1985), which is incorporated by reference in section 3501 (see n. 5 above), provides in pertinent part:

The complaint shall state that the plaintiff claims a lien on the house, building or appurtenances, or on the wharf, pier or building thereon, as the case may be, described therein, and the land on which it stands, for labor or services performed or for labor, materials or services furnished, in erecting, altering, moving or repairing said house, building or appurtenances, or in constructing, altering or repairing said wharf, pier or building thereon, as the case may be; whether it was by virtue of a contract with or by consent of the owner, and if not, that the claimant has complied with section 3253.

pertinent part: "Plaintiff [Twin Island] ... performed certain labor and furnished certain materials, all of which ... entered into and were used *in improving the land* [of Catherine Winchester]...." (Emphasis added) Plainly, the language "improving the land" generically encompasses the specific work of "laying out or construction of any road, path or walk."

■ As her sole attack upon the pleading adequacy of the complaint, defendant Catherine Winchester contends that, regardless how familiar she was with the road construction work done with her consent and under her contract, Twin Island's complaint has a fatal defect since it does not recite specifically the subcategory of work in improving her land that the lien suit involves. On the facts of this case, we find her argument overly technical and productive of an injustice to a lienor who has performed lienable work pursuant to a contract with the owner herself. Catherine Winchester, the owner of the property, having permitted herself to be bound contractually for the road work and also having consented to its being done, is in no position to assert any such technical deficiency in Twin Island's complaint. No prejudice whatever resulted to her from the use by the complaint of a generalized description of the work, rather than the more specific "magic language" of section 3501. The "improving of the land" language was in no way an incorrect description of the work done; at worst it was overbroad. No harm whatever came to defendant from that overbreadth.

We have long adhered to the principle that the mechanic's lien statutes will be construed and applied liberally "to further their equity and efficacy, when it is clear that the lien has been honestly earned, and the lien claimant is within the statute." *Shaw v. Young,* 87 Me. at 274, 32 A. at 898 (lien statute construed to make estate subject to lien coextensive with the estate benefited by lienable work). That principle guided our decision in *Otis Elevator Co. v. Finks Clothing Co.,* 131 Me. 95, 159 A. 563

(1932). The plaintiff, Otis Elevator, installed an elevator in a building in Portland and brought suit to enforce a lien, reciting only that it had "installed the materials and furnished the labor required to complete the contract, in the building located at 234 Middle Street, Portland." *Id.* at 97, 159 A. at 564. At that time, R.S. ch. 105, § 66 (1930) required that: "The declaration must show that the suit is brought to enforce the lien." Even though the declaration referred only to the "building," this court held that the plaintiff's declaration in a suit against the owner of the building who contracted for the work also adequately asserted a lien against the owner's land on which the building stood, as authorized by the lien statute. A similar practical construction of the complaint brought to enforce a lien against a contracting owner who is completely familiar with the nature of the lienor's work "in improving the land" should be applied in the present case.

As against Catherine Winchester, who contracted with Twin Island to perform the road work on her property, we are unwilling to find any fatal deficiency in Twin Island's pleading of the statutory lien upon her property that arose under section 3501 as soon as the work was done. Our conclusion is well supported by case authority from other jurisdictions. *See Nelson Weaver Mortgage Co. v. Dover Elevator Co.,* 283 Ala. 324, 216 So.2d 716, 721–22 (1968) (mechanic's lien pleading requirements liberally construed); *Andersen v. Turpin,* 172 Or. 420, 142 P.2d 999, 1004 (1943) (substantial compliance with mechanic's lien pleading requirements is sufficient). *Cf. Ray Heating Products, Inc. v. Miller,* 74 Nev. 124, 324 P.2d 237, 238 (1958) (general allegation in lien statement that work was performed for improvement on property, without particular description, is sufficient); *Garrett Building Centers, Inc. v. Hale,* 95 N.M. 450, 623 P.2d 570, 573–74 (1981) (substantial compliance with lien statement requirements is sufficient as between immediate parties); *Lowery v. Haithcock,* 239 N.C. 67, 79 S.E.2d 204, 208

(1953) (same); *Mathews Construction Co. v. Jasper Housing Construction Co.,* 528 S.W.2d 323, 329 (Tex.Civ.App.1975) (substantial compliance with lien statement requirements is sufficient); *Earp v. Vanderpool,* 160 W.Va. 113, 232 S.E.2d 513, 516 (1976) ("detail ... necessary to establish a sufficient description of the improvements [in lien statement] is subject to a liberal construction").

Our decision is confined to the facts of this present case. We here are not involved with a third party materialman or a subcontractor to whom the owner had no personal contractual obligation and who also failed to comply with important statutory requirements such as the filing of a sworn lien claim, *Pineland Lumber Co. v. Robinson,* 382 A.2d 33 (Me.1978), or the timely filing of any lien claim at all, *Lyon v. Dunn,* 402 A.2d 461 (Me.1979).

We do not find any shortcoming in the allegations of Twin Island's complaint of such seriousness as to require us to vacate the lien judgment against Catherine Winchester's property.

## II. *Contract Claim*

The contract claim on which Twin Island prevailed against defendant was grounded in a theory of apparent authority. By unanimous vote, the jury found that Hugh Winchester had apparent authority to act as Catherine Winchester's agent for the purpose of contracting for the work performed by Twin Island. On appeal defendant challenges both the propriety of the jury instructions and sufficiency of the evidence as to that basis for Catherine Winchester's personal liability on a contract with Twin Island.

### A. *Jury Instructions*

■ Defendant made timely objections to each of the instructions she now challenges on appeal; however, the record does not show that she ever stated the basis of those objections. Her objections, there-

fore, were not preserved for appeal; we can review them only under the obvious error standard. *See* M.R.Civ.P. 51(b) ("No party may assign as error the giving [of] ... an instruction unless he objects thereto ... stating distinctly ... the grounds of his objection). Thus in the case at bar the judgment of the Superior Court will be disturbed only if (1) "the instruction failed sufficiently to inform the jury correctly and fairly in all necessary respects of governing law," *Eckenrode v. Heritage Management Corp.,* 480 A.2d 759, 763 (Me. 1984),[9] and (2) the error was of a kind " 'exceptional' in an action civil in nature, that has 'seriously affected the fairness, integrity, or public reputation ...' of the proceeding." *Knight v. Penobscot Bay Medical Center,* 420 A.2d 915, 919 (Me.1980) (quoting *Morris v. Travisono,* 528 F.2d 856, 859 (1st Cir.1976)).

### 1. *Instruction on Apparent Authority*

■ Question No. 5 on the special verdict form asked the jury: "Did Hugh Winchester have apparent authority to make a contract with plaintiff on behalf of his wife Catherine?" The jury by an 8–to–0 vote answered in the affirmative. Defendant now argues that the presiding justice erred in instructing the jury on the law governing whether Hugh Winchester had apparent authority to contract for his wife for work on her farm. She concedes that the presiding justice, who gave the instruction that defendant herself requested, correctly stated the basic law of apparent authority. That portion of the charge reads:

> Apparent authority can arise if the principal knowingly or negligently holds someone out as possessing authority to act for him or her, even though no actual authority has been given....

> It's important to keep in mind that it is the conduct of the principal and not of the agent and the effect of that conduct

[9]. *See also Murray v. Eastern Maine Medical Center,* 447 A.2d 465 (Me.1982); *St. Pierre v. North*

*East Ins. Co.,* 471 A.2d 1049 (Me.1984).

on others who are led to believe that someone is acting for the principal that provides the legal basis for holding the principal responsible for the acts and contracts of an apparent agent.

That instruction is clearly consistent with our rulings and the legal doctrine of apparent authority. *See Ocean National Bank of Kennebunk v. Diment*, 462 A.2d 35, 38 (Me.1983); *Restatement (Second) of Agency* §§ 8, 27, 159, 292 (1958). *See generally* 3 Am.Jur.2d *Agency* § 84 (1962); 1 A. Corbin, *Corbin on Contracts* § 33, at 133 (1963). It faithfully follows our ruling in *Libby v. Concord Gen. Mut. Ins. Co.*, 452 A.2d 979, 982 (Me.1982), that

> "[A]pparent" authority is "that which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing." *Stevens [v. Frost*, 140 Me. 1, 7, 32 A.2d 164, 167–68 (1943) ]. Apparent authority exists only when the *"conduct of the principal* leads a third person to believe that a given party is his agent." *Brown v. Manchester*, 384 A.2d 449, 453 n. 4 (Me.1978) (emphasis in original) (citing *Restatement (Second) of Agency* § 8 (1958)).

We can find no error whatever, let alone obvious error, in the quoted instruction.

■ The presiding justice went on to charge the jury that there was another ground, alternative to the apparent authority theory, on which it could find Catherine Winchester personally liable in contract to plaintiff. That alternative basis for her contractual liability was raised by Question No. 6 on the special verdict form, reading: "Did Catherine Winchester contract with the plaintiff for the work in question by being present when the work was being

done and remaining silent?" Pertinent to that later question, the presiding justice instructed the jury that Catherine Winchester could be held personally liable if they found that in all the circumstances of the case she had the opportunity to order plaintiff to stop its work but chose to remain silent. On appeal defendant argues that that instruction was error. We, however, need not decide whether the presiding justice was right or wrong because in any event the jury found unanimously that Hugh Winchester had apparent authority to act as his wife's agent. That finding of fact, standing alone, justifies the court's entry of judgment against Catherine Winchester personally for contract damages. We reject defendant's argument that the jury in deciding Question No. 5 on apparent authority might have been confused by the instruction relating to Question No. 6 on an implied contract arising from silence. No one reading the extensive record evidence of apparent authority would conclude that any possible error or confusion would rise to the level of "seriously affect[ing] the fairness, integrity, or public reputation" of this proceeding.

### 2. *"Missing Party" Instruction*

■ Defendant also attacks the presiding justice's instruction that permitted the jury, in answering Question No. 5 on apparent authority, to draw an unfavorable inference from Catherine Winchester's failure to testify.[10] We, however, can find no obvious error in this "missing party" instruction as given in the circumstances of this trial.

In the way this case was tried to the jury, Catherine Winchester was the one and only remaining defendant. Hugh Winchester had defaulted. Her personal con-

---

**10.** In pertinent part, the instruction reads: "If a party fails to produce evidence which is under his or her control and reasonably available and not reasonably available to the adverse party, then you may infer that the evidence is [un]favorable to that party who could have produced it and did not produce it." That particular language comes directly from a standard work on federal jury instructions, 2 E. Devitt & C. Black-

mar, *Federal Jury Practice and Instructions* § 72.17, at 612 (3d ed.1977). Although broader than it needed to be, the instruction in the context of the evidence presented to the jury has application only to Catherine Winchester, the absent defendant, and to her own potential testimony on the apparent authority and other issues of the case.

tract liability turned on whether her own conduct justified a third party's belief that her husband, Hugh Winchester, acted as her agent. In the face of the adverse testimony of Twin Island's witnesses regarding Catherine Winchester's conduct, she chose, without explanation, not to testify or even appear at the trial. In those circumstances, "the unexplained failure of [defendant] to testify with respect to material facts within [her] own knowledge, or to take the stand and deny the existence of material facts testified to by the adverse party, [was] a proper matter for the consideration of the jury." *Scribner v. Cyr,* 148 Me. 329, 333, 93 A.2d 126, 129 (1952). A long line of Maine cases supports the "missing party" instruction. *See Page v. Smith,* 25 Me. (12 Shepley) 256, 266 (1845); *Perkins v. Hitchcock,* 49 Me. 468, 477 (1860); *Union Bank v. Stone,* 50 Me. 595, 599 (1862); *York v. Mathis,* 103 Me. 67, 81, 68 A. 746, 752 (1907); *Devine v. Tierney and Findlen,* 139 Me. 50, 55–56; 27 A.2d 134, 136 (1942); *Berry v. Adams,* 145 Me. 291, 295, 75 A.2d 461, 464 (1950). *See generally* 2 *Wigmore on Evidence* § 289 (Chadbourn rev.1979); 29 Am.Jur.2d *Evidence* § 188 (1967).

▇ The situation in the case at bar is substantially different from that in *State v. Brewer,* 505 A.2d 774 (Me.1985), where we held that "the failure of a *party to call a witness* does not permit the opposing party to argue, or the factfinder to draw, any inference as to whether the witness's testimony would be favorable or unfavorable to either party." *Id.* at 777 (emphasis added). That decision was founded upon a reexamination of the "missing witness" rule in light of the Maine Rules of Evidence. Those rules repudiate the common law principle that a party vouches for the credibility of its witnesses. *See* Field & Murray, *Maine Evidence* § 607.1 (1976). M.R. Evid. 607 removed any basis for the "missing witness" rule, by providing: "The credibility of a witness may be attacked by any party, including the party calling him." *See also* M.R.Evid. 607 Advisers' Note, *re-*

*printed in* Field & Murray, *Maine Evidence* 136. Clearly, the rationale behind our ruling in *State v. Brewer* does not apply to this case. Defendant need not vouch for her witnesses; nonetheless, the jury is entitled to consider whether she is willing to vouch for her own position in the circumstances of this civil litigation. As the case was presented to the jury, no one had a greater interest than defendant in defeating the contract claim and no one was in a better position than defendant "to take the stand and deny the existence of material facts testified to by the adverse party." The facts of her relationship with Hugh were peculiarly within her knowledge. To prohibit the jury from considering the implications flowing naturally from Catherine Winchester's unexplained absence from the trial, as she now urges us to do, would be to require the jury to disregard highly relevant and probative evidence. "To direct a jury to disregard [defendant's failure to testify] would be to direct them to disregard a fact existent, material and probative." *Union Bank v. Stone,* 50 Me. at 599. *A fortiori,* in the circumstances of this case, the presiding justice did not commit any obvious error in giving the "missing party" instruction.

### B. *Sufficiency of the Evidence of Apparent Authority*

▇ Defendant finally asserts that there was insufficient evidence to support the jury's finding of apparent authority. We accord extraordinary deference to the findings of fact made by a civil jury. The applicable standard of review is "that [the] verdict must be sustained if *any* credible evidence, and all justifiable inferences drawn from such evidence, viewed in the light most favorable to the plaintiff, support the verdict." *Redlon's Inc. v. Gilman,* 485 A.2d 661, 662 (Me.1984) (emphasis added). Even a casual review of the record in the case at bar reveals ample evidence to meet that standard. Catherine Winchester had discussions with Garnache about the project initiated and directed by Hugh; she expressed an understanding of

.. 

the scope of the project and a desire that it be completed as quickly as possible; she was present when her husband and Garnache discussed the project; she lived on the Kennebunkport farm (which under the bond for a deed she was buying in her sole name) while the construction was under way and made no effort to halt the road work, but rather talked directly with Garnache about it; and she explained the nature and purpose of the project to friends and acquaintances. Moreover, since Hugh and Catherine Winchester at the time of plaintiff's work lived together as husband and wife, the jury was entitled to draw the inference that they discussed, considered, and agreed to enter into a contract with plaintiff for the road work performed that summer on the Winchester property.[11] After hearing that evidence, the jury was specifically instructed by the presiding justice: "You must be satisfied that the plaintiff has proven ... that as a result of [defendant's] conduct ... the plaintiff was led to believe that Mr. Winchester was her agent...." Plainly, the jurors answered unanimously that they were so satisfied, and, equally plainly, there was more than sufficient evidence to justify their conclusion.

The entry is:

Judgment of mechanic's lien in the amount of $27,355.90 plus interest and costs against the subject property affirmed.

Judgment for plaintiff in the amount of $27,355.90 plus interest and costs against defendant Catherine Winchester affirmed.

All concurring.

11. Defendant seeks to diminish the evidentiary significance of Catherine and Hugh Winchester's marital relationship by arguing, quite correctly, that there is no presumption in Maine law that one spouse speaks as the agent for the other. That argument, however, has no consequence on this record since neither Twin Island's counsel in presenting its case nor the court in instructing the jury relied on any such presumption. Instead, the jury was entitled to consider the Winchesters' marital relationship as merely one factor in reaching its finding of apparent authority. "Neither husband nor wife by virtue of the relation has power to act as agent for the other. The relation is of such a nature, however, that circumstances which in the case of strangers would not indicate the creation of authority or apparent authority may indicate it in the case of husband or wife." *Restatement (Second) of Agency* § 22, comment b (1958).