Nelson LATREMORE, et al.

v.

Lewis LATREMORE.

Supreme Judicial Court of Maine.

Argued Nov. 16, 1990.
Decided Dec. 26, 1990.

---

James R. Erwin (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for plaintiff.

Kenneth Clegg (orally), Bourque & Clegg, Sanford, for defendant.

Before WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

BRODY, Justice.

Lewis Latremore appeals from a judgment entered by the Superior Court (York County, *Bradford, J.*) following a jury verdict determining that Nelson and Barbara Latremore are life tenants in a large apartment located on property owned by their son, Lewis Latremore, and awarding Barbara and Nelson damages of $25,000 each for intentional infliction of emotional distress. On appeal Lewis challenges the sufficiency of the evidence to support the jury's finding on the issue of extreme and outrageous conduct in connection with the emotional distress claims. Lewis also contends that the court erred in admitting testimony about a conversation between Lewis and his sister, Laura Cusack, denying his request for a missing witness instruction, excluding evidence regarding previous lawsuits and denying his request that a juror be excused. We affirm the judgment.

In September, 1975, Nelson Latremore sold to his son, Lewis, property located along the York River in York County. The property, known as Rivercorral, consists of several acres and a house which was once the Latremore family home. The house has since been divided into three separate apartments, one large and two small. In connection with the sale of Rivercorral, Lewis and Nelson signed a "lease agreement" giving Nelson and his wife Barbara the right to occupy "a certain apartment" on the property for 20 years with a right of renewal for an additional 20 years. The agreement did not specify which of the three apartments Barbara and Nelson were entitled to occupy. The intent of the contract of sale, as stipulated by the parties, was that Lewis would add Rivercorral to his growing real estate business at a reduced price and his parents would live there rent-free for the rest of their lives. At the time of the sale, Nelson and Barbara lived in one of the small apartments but claim that they expressed their intent to move in to the large apartment in the main part of the house when it became vacant. In August 1981, they moved into the large apartment believing that the lease agreement entitled them to do so.

From the time he retired in 1977 until 1984, Nelson managed Rivercorral for Lewis. He collected rents, made repairs and handled the finances. In exchange, Lewis paid for Nelson and Barbara's electricity bills. Nelson's obligations at Rivercorral were terminated in 1984 as the relationship between Lewis and Nelson began to sour over, among other things, Nelson's refusal to move back into the small apartment. Soon thereafter, Lewis ceased to pay the electric bills for his parents resulting in a suit being filed by Nelson against Lewis in small claims court. Nelson later withdrew the suit. The issue of Lewis's obligation to pay Nelson and Barbara's electric bills is one of the issues in dispute in the present litigation.

In June, 1986, Lewis told Nelson and Barbara that he would evict them unless

they either moved back into the small apartment or paid rent for the large one. He insisted, contrary to their understanding, that the 1975 lease agreement did not give them the right to stay in the large apartment. Despite Lewis's threats, Nelson and Barbara remained in the large apartment and refused to pay rent.[1] From August 1986 through July, 1989, Lewis sent his parents monthly statements for rent and other expenses in amounts in excess of $3,000 per month. The final statement shows Nelson and Barbara owing Lewis over $100,000.

In September 1986, Nelson and Barbara brought this action against Lewis seeking a declaratory judgment to establish their right under the 1975 lease agreement to live, rent-free, as life tenants in the large apartment. They also sought damages for intentional infliction of emotional distress. Following a four day trial, the jury found that the 1975 lease agreement allowed Nelson and Barbara to inhabit the large apartment, rent-free, as tenants for life. The jury further found that Lewis had no obligation to pay his parents' electric bills but found that he was obligated to provide and pay for heat in the large apartment. On the intentional infliction of emotional distress claims, the jury granted Nelson and Barbara $25,000 each in damages. The court denied Lewis's post-trial motions to amend the jury's findings of fact, to alter the judgment and for a new trial and Lewis appealed.

### Extreme and Outrageous Conduct

Lewis contends that the evidence produced at trial was insufficient to support the jury's verdict on the issue of the extreme and outrageous nature of his conduct. To recover on a claim of intentional infliction of emotional distress the plaintiff must establish that the defendant's conduct was "so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious and utterly intolerable in a civilized community.'" *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me.1979); Restatement (Sec-

ond) of Torts § 46, Comment d (1965). Lewis contends that he was merely asserting his contractual rights under the 1975 lease agreement and that his actions cannot reasonably be considered so extreme and outrageous as to exceed all possible bounds of decency.

To challenge a jury's verdict on appeal, the appellant must demonstrate that, taking all evidence in the light most favorable to the plaintiff, together with any justifiable inferences, there was no credible evidence upon which a rational jury could have found the facts as it did. *Gurski v. Culpovich*, 540 A.2d 764, 767 (Me.1988). Our review of the record reveals ample evidence to support the jury's finding that Lewis's conduct was sufficiently extreme and outrageous to support liability. Although the 1975 lease agreement was ambiguous, Lewis went far beyond a fair reading of the agreement by demanding that his parents pay up to $3,000 per month in rent for the large apartment and by threatening to evict them if they failed to do so. Lewis continued with his demands and threats even though he knew that his parents were aged and that Barbara was in poor health. Added to this is the evidence that Lewis made a number of vicious remarks to his father regarding his father's mental condition, apparently without justification, and even attempted to elicit his sister's assistance in having his father declared mentally incompetent. Viewing the evidence in the light most favorable to the plaintiffs, as we must, there is credible evidence in the record to support the jury's finding and we will not disturb it on appeal. Lewis has not challenged the sufficiency of the evidence supporting the jury's findings with respect to the other elements of the cause of action.

### Telephone Conversation

At trial, over Lewis's objection, the court admitted testimony from Laura Cusack, Lewis's sister, regarding a telephone call in which Lewis tried to solicit Laura's help in

---

**1.** Nelson and Barbara felt that the large apartment, which had a bedroom and bathroom on the ground floor, was better for Barbara who suffered from debilitating arthritis.

having Nelson declared mentally incompetent. Laura testified that Lewis implied that he could assert financial pressure on her if she refused. She told the jury that she was outraged and that she told her parents of Lewis's attempted manipulation. The court admitted Laura's testimony for the limited purpose of establishing Lewis's state of mind, specifically that he intended to cause his parents to suffer emotional distress.[2] Later in the trial, Barbara testified, again over Lewis's objection, regarding the extent to which she and Nelson were upset when they learned about the conversation between Lewis and Laura. Barbara's testimony was admitted to establish causation. Barbara told the jury that Lewis's conduct caused Nelson weight loss, sleeplessness, anxiety, nervousness, nightmares and worry over not being able to live in their home and pay their bills.

On appeal, Lewis contends that Laura and Barbara's testimony regarding the telephone conversation was improperly admitted. Lewis contends that the testimony was not relevant to the cause of action and should have been excluded pursuant to the Restatement (Second) of Torts § 46(2) (1965) and also on the basis of the first amendment's protection of free speech. Lewis further contends that Barbara's testimony was inadmissible as hearsay. We find that § 46(2) is inapplicable to this set of facts, that Lewis's first amendment argument is without merit and that admitting Barbara's testimony did not violate the rule against hearsay. The testimony was clearly relevant on a number of issues and was properly admitted by the court.

 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.Evid. 401. The trial court is accorded wide discretion in its determination as to whether proffered evidence is relevant. *Gurski v. Culpovich*, 540 A.2d at 766. The trial court's ruling on relevance is reviewa-

ble only for abuse of discretion. *Id.* The factual elements of the tort of intentional infliction of emotional distress are (1) intentional or reckless conduct which inflicts severe emotional suffering or would be substantially certain to result in such suffering; (2) conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable; (3) the defendant's conduct must cause the plaintiff emotional suffering; and (4) the plaintiff's emotional suffering must be severe so that no reasonable person could be expected to endure it. *Vicnire v. Ford Motor Credit Co.*, 401 A.2d at 154; Restatement (Second) of Torts § 46(1) (1965). Laura's testimony regarding Lewis's telephone call to her was probative of Lewis's state of mind in intending to cause emotional distress to Nelson. In addition, Laura's testimony was relevant as one of several acts tending to establish outrageous conduct. Barbara's testimony was relevant on the issue of causation.

 Lewis's reliance upon § 46(2) of the Second Restatement to exclude this otherwise relevant evidence is misplaced. Section 46(2) provides:

Where [defendant's] conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) of Torts § 46(2) (1965). This section is designed to apply in a situation where the intent to cause harm is directed toward a third party and the plaintiff is injured indirectly by watching the third party suffer. Such facts are not presented here. Even though Lewis's call was made to Laura, the fact that it was made evidences Lewis's intent to cause harm to his father, not to Laura. Section

---

2. Although the court gave no limiting instruction to the jury regarding Laura's testimony, the defendant has waived his right to challenge the instruction on appeal by failing to request a limiting instruction. *Vicnire v. Ford Motor Credit Co.*, 401 A.2d at 151.

46(2) simply does not apply to the facts of this case. We reject Lewis's argument that the court should apply § 46(2) to obviate first amendment concerns for the protection of truthful speech. We find no first amendment concerns presented by the facts of this case.

▬▬▬▬ Contrary to Lewis's contention, Barbara's testimony was not hearsay because it was not offered to prove that Lewis made the call to his sister nor to establish the content of the conversation.[3] Rather, Barbara's testimony was presented to show the emotional impact upon Nelson when Laura told her parents about Lewis's call. Laura's testimony, on the other hand, was offered to prove that the call was made and to establish the content of the conversation. Although hearsay, Laura's testimony was admissible to show the declarant's then existing state of mind. Such testimony is not excluded by the hearsay rule, even though the declarant is available as a witness. M.R.Evid. 803(3).[4] The court properly admitted the testimony regarding the telephone conversation.

### The Lack of Expert Witnesses

▬▬▬▬ At trial, Nelson testified that Lewis's conduct caused a deterioration in Barbara's health. He detailed each physical symptom including nervousness, shaking and a worsening speech impediment. Nelson and Barbara did not present expert testimony from their physicians to corroborate Nelson's testimony.[5] On appeal, Lewis contends that the court erred in denying his request for a missing witness instruction that would have allowed the jury to draw an adverse inference from the plaintiffs' failure to present corroborating testimony from their physicians.

This court has held that "the failure of a party to call a witness does not permit the opposing party to argue, or the fact-finder to draw, any inference as to whether the witness's testimony would be favorable or unfavorable to either party." *State v. Brewer,* 505 A.2d 774, 777 (Me.1985). In *Twin Island Development Corp. v. Winchester,* 512 A.2d 319, 326 (Me.1986), we held that the *Brewer* rule does not apply when the missing witness is a party and in the best position to testify as to a material fact in issue. In *Twin Island,* the defendant chose, without explanation, not to testify or even appear at the trial even though there were material facts in issue that were solely within her own knowledge. Under those circumstances, we held that the defendant's unexplained failure to testify to a matter raised by the adverse party was a proper matter for the jury's consideration and concluded that the trial court did not commit reversible error by giving a missing party instruction. *Twin Island Development Corp. v. Winchester,* 512 A.2d at 326. The present case does not present a situation where the missing witness was in the best position to testify about a material fact or was a party to the action. Nelson was competent to testify about the changes he noticed in his wife's health. Indeed, Barbara's physician was not in a better position than Nelson to testify as to the changes in Barbara's health. Lewis was not entitled to a missing witness instruction.

▬▬▬▬ Of greater concern to this court is whether the evidence of severe emotional suffering was sufficient, as a matter of law, in the absence of corroborating testimony from a physician. Under the circumstances of this case, we find no requirement that the plaintiffs' testimony must be corroborated by the testimony of an expert. *Cf. Blais v. Davis,* 358 A.2d 552 (Me.1976)

**3.** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.Evid. 801(c).

**4.** M.R.Evid. 803(3) creates an exception to the hearsay rule for:
 A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition such as intent, plan, motive, design, mental feeling, pain, as bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

**5.** Nelson and Barbara listed two physicians as witnesses in their Memorandum of Conference of Counsel but did not call them as witnesses at trial.

(medical expert testimony not necessary to corroborate plaintiff's testimony establishing a causal relationship between medical bills produced at trial and her injuries). In *Vicnire* we noted that

> [a]lthough 'severe' emotional distress is usually manifested by 'shock, illness or other bodily harm,' such objective symptomatology is not an absolute prerequisite for recovery of damages for intentional, as opposed to negligent, infliction of emotional distress. In appropriate cases, 'severe' emotional distress may be inferred from the 'extreme and outrageous' nature of the defendant's conduct alone.

*Vicnire v. Ford Motor Credit Co.*, 401 A.2d at 154; Restatement (Second) of Torts 46, Comment K; *accord Gammon v. Osteopathic Hospital of Maine*, 534 A.2d 1282, 1284–85 (Me.1987). We find that the issue of the plaintiffs' injuries was properly submitted to and decided by the jury. And, because it is supported by credible evidence, the jury's verdict will not be disturbed on appeal. *Gurski v. Culpovich*, 540 A.2d at 767.

### Other Lawsuits

▆▆▆ Next, Lewis . contends that the court erred in refusing to allow him to elicit testimony from Nelson on cross-examination that Nelson had been involved in seven previous lawsuits. Lewis contends that this evidence was probative in demonstrating that Nelson is a man of tough character and not particularly susceptible to emotional distress.

▆▆▆ Evidence of character is admissible when character is essential to a claim or defense. Such evidence may be presented by testimony as to reputation or by proof of specific instances of conduct.[6] Character is an essential element of a claim or defense when the law defining the claim or defense requires that it be proved. *See, e.g., State v. Doherty*, 437 A.2d 876, 878 (Me.1981). Although evidence of the plaintiff's character for toughness is not an essential element to a claim for intentional infliction of emotional distress, evidence of Nelson's character was arguably admissible on the issue of credibility to rebut the inference that Nelson was not the frail old man he professed to be before the jury.[7] We find, however, that the court acted soundly within its discretionary power in excluding, pursuant to M.R.Evid. 403[8] and 608(b), evidence of prior legal matters which were only of marginal relevance to the issues before the jury.[9] There is no abuse of discretion in the Court's ruling excluding the evidence.

▆▆▆ The court also refused to allow Lewis to introduce into evidence the findings of fact entered by the New Hampshire Superior Court in a previous dispute between Nelson and Lewis. The dispute arose over money Nelson loaned to his son in three separate demand notes between 1975 and 1981. In June 1984, Nelson agreed, at Lewis's request, to consolidate

---

6. M.R.Evid. 405 provides:

 METHODS OF PROVING CHARACTER
 (a) Reputation. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
 (b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim or defense, proof may also be made of specific instances of conduct.

7. M.R.Evid. 608(b) provides:

 Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

8. M.R.Evid. 403 provides:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by needless presentation of cumulative evidence.

9. The jury had already learned of two previous suits by Nelson against Lewis.

and amortize the notes over a 25 year period. Later, Nelson sued Lewis in New Hampshire Superior Court to invalidate the consolidation. A New Hampshire special master upheld the consolidation. According to Lewis, the master's findings demonstrate that Nelson's challenge to the 1984 loan consolidation was unreasonable. On appeal, Lewis contends it was error to exclude this evidence. Again, the court's ruling was discretionary pursuant to M.R. Evid. 403 and will be disturbed on appeal only for abuse of discretion. *Gurski v. Culpovich*, 540 A.2d at 766. Because the New Hampshire dispute was, at best, a peripheral matter, we find no abuse of discretion in the court's ruling excluding the evidence.

### Juror Impartiality

Lewis contends that the court erred when it ruled that a juror would be permitted to continue to serve after she overheard part of a conversation between Lewis and his attorney regarding a settlement conference at the courthouse following the second day of trial.

▮▮▮▮▮ When the impartiality of an empaneled juror is called into question, the presiding justice should interview the juror about the circumstances in order to determine whether the juror can remain impartial. *State v. Prentiss*, 557 A.2d 619, 621 (Me.1989); *Poulin v. Colby College*, 402 A.2d 846, 853 (Me.1979). On appeal, the trial court's determination is accorded substantial deference because of the presiding justice's ability to observe the juror and assess credibility. *Id.* The trial court's determination is reviewed only for abuse of discretion. *Id.*

▮▮▮ The record indicates that the presiding justice interviewed the juror and determined exactly what she had heard. The justice received the juror's assurance that she heard nothing more than "somebody say, oh, you owe," and that she believed she could remain impartial. We find no abuse of discretion in the court's decision to retain the juror.

We have reviewed Lewis's remaining contentions and find them without merit.

Entry is:

Judgment affirmed.

All concurring.