STATE OF MAINE
CUMBERLAND, SS

STATE OF MAINE
CUMBERLAND, SS
CLERK'S OFFICE

2009 JUL 24  P 3: 25

SUPERIOR COURT
Civil Action
Docket No. CV-06-145

ELIZABETH LYMAN,

      Plaintiff

    v.                                    **DECISION AND JUDGMENT**

LUKE HUBER,

      Defendant

## I. BEFORE THE COURT

This case was tried before the court, without a jury, on facts and issues arising out of a long-time romantic relationship between the parties. After the relationship deteriorated and they separated, the plaintiff filed a complaint from which five counts survived for trial: (Count I) equitable partition of real estate jointly owned by the parties; (Count II) damages for waste and/or trespass; (Count III) "ouster"; (Count VII) intentional infliction of emotional distress and (Count VIII) punitive damages.[1]

## II. DISCUSSION AND FINDINGS[2]

The defendant Luke Huber ("Huber") was involved in a romantic relationship with the plaintiff, Elizabeth Lyman ("Lyman"), for approximately fifteen years, beginning in 1991. They met at a Christmas party in 1991 at Huber's parent's home in

---

[1] Plaintiff's additional claims for unjust enrichment (Count IV), quantum meruit (Count V) and negligent infliction of emotional distress (Count VI) were previously decided by the court's Order granting summary judgment in favor of the defendant.

In addition, the defendant withdrew his counterclaim prior to trial.

[2] To the extent that the court recites the factual history of the case, they constitute findings by a preponderance of evidence unless otherwise stated.

Falmouth. At that time Huber was working and living in Saratoga Springs, New York. Despite the distance, Lyman and Huber started to date right away and the relationship moved forward quickly. By mid-1994, Libby was concerned about getting older and she wanted a family. She discussed her feelings with Luke, but "at that time he wasn't ready." Nevertheless, the parties discussed buying property together, and did so in November 1994.

Lyman had been boarding three horses at 150 Two Lights Road in Cape Elizabeth. The owners were getting divorced and Lyman knew they wanted to sell. The property included three and a half acres, a barn, paddock, riding arena, trails, and a house. She asked the owners not to put it on the market and she tried to arrange financing to buy it with assistance from her parents. She told Luke about her plan and she was very surprised when he said he would buy it for her. He felt it was the best he could do at the time to make a commitment. Luke purchased the property for $152,669. Libby moved in during the fall of 1994, and Luke moved in a few months later on a part-time basis. Their relationship was "wonderful." They started to renovate the home and planned to expand it when children arrived.

Huber paid the total purchase price at the time and Lyman made contributions later.[3] Lyman lived there full-time until she moved out in April of 2006. Huber did not live there full-time until some time in late 2002 or 2003.

Even though Luke purchased the property with his money and in his name, Libby understood that "they" were to own the property and that eventually it would go to the survivor. It was important to Libby to have an ownership interest because of her horse business.

---

[3] The parties were initially listed as joint tenants, but later executed a quitclaim deed that changed their ownership status to tenants in common.

During their relationship, Huber paid for most of the household expenses, and also contributed money for Lyman's horse business and her personal expenses. Lyman was responsible for virtually all of the household chores, including cooking, cleaning, food and household shopping, snow plowing, lawn mowing, and landscaping. Huber claims that he performed some of the household labor, but that is not supported by the evidence, in fact, his conduct was a substantial obstacle for Lyman's efforts to keep an orderly home.

Shortly after purchasing the property, they began renovations. Lyman's brothers were to help with the project, but they were not finished by the time Lyman and Huber held an open house in the spring 1995.

Shortly after the open house the renovations stopped, and the relationship started to change. Luke began acting strangely and became very assertive and authoritative. He commanded Libby not to touch his things or to move the mail. When he was taking his morning should he would regularly yell, scream, and swear. He would stomp and kick walls. Luke's bizarre behavior continued over time and escalated. He became more demanding of her time, and there were more tirades and complaints of her use of the telephone. Luke screamed about a small piece of horse manure in the driveway. He became obsessive about taking showers and he was constantly washing his hands. His personal belongings were spread out all over the house to the point that there were paths to get from one room to another. He inspected his bed and sheets with a flashlight before getting in.

After the open house their intimacy deteriorated as well. At first if was OK, but after time "sex was dirty." Luke would recoil from a mere hug.

Luke's actions had a substantial emotional impact on Libby. Although he never struck out or physically abused her, he was very commanding and intimidating to the

point that she was afraid of him and "afraid of his anger." Libby became socially paralyzed, and she withdrew from her friends. In order to avoid his wrath, she would ask him how he wanted things done so that he would not get mad.

In the beginning, Libby would ask him to help with chores. Before he left for work in New York, he would help out and pick up. Later he would leave things as they were and tell her not to touch anything. Luke insisted that Libby "be available" when he was home. She had to clear her schedule, cancel lessons and appointments, and not have any social engagements. Libby was afraid to not be available. Libby's family visited less frequently and when they did she asked them not to touch Luke's things or sit in his chair. When Libby's mother put a sweater on some of this things he got very upset and offered no apology.

Luke's strange and compulsive behavior interfered with her horse business so that she eventually closed down horse business when she had about eighty-five clients.

Libby realized that the only way out was to leave, but she could not. Every so often he would "do something nice." They went boat shopping in Boston, stayed in a fancy hotel with fine dining. Libby was not aware of Luke's income but "knew he didn't have to work for a living." She felt it was strange that he would buy a large expensive pleasure boat, but not spend money to repair the house.

In February of 2004, Libby broke her ankle. Luke took her to a doctor and left her there. She had to call a friend to take her to the hospital. She received no help from him even though she could not help herself while she recuperated.

Even though Libby realized that Luke was not a person she could rely upon for support, she wanted to repair and salvage the relationship, but he would not join her in counseling.

## A. Equitable Partition

When the property was purchased, the sellers conveyed it to the parties as joint tenants. A short time later, Huber and Lyman re-conveyed it to themselves as tenants in common. Although their motives for doing this are somewhat cloudy, it is clear that they initially regarded themselves as equal owners. The easiest way to describe their personal investment in the property is that Huber provided the bulk of the financing for the purchase and continuing expenses and Lyman acted as the property manager.

After the parties exchanged the new deeds, Lyman made payments of $23,500 to Huber for a non-specific share of the property.[4] Huber's additional contributions for property taxes, insurance, utilities and materials for upkeep and renovations total approximately $60,000. Over all, Huber's net contribution for the purchase and property expenses comes to $194,327.

With an exception of "all cooking", he court accepts plaintiff's calculation of her time and effort for maintaining and improving the property and the sums she personally paid for property improvement (plaintiff's exhibits 11 and 12). The total of 6,552 for "all cooking" is a very large amount of time; however, Huber was not present for substantial periods. The cooking was necessary for herself during his absence and even at times when he was there; further, the court cannot link the cooking with property management, maintenance or improvement.

Lyman lists a total of 4,330 hours. This amount of time over the years is not unreasonable. The value of her services to the property is $64,950 plus $3,839 she paid for improvements to the driveway and horse facilities. Notwithstanding that the areas

---

[4] The payments are credited as $500 down payment, $17,842 towards the purchase price and $5,158 as interest.

of the property were dedicated to her business, her improvements to the paddock, arena and lean-to, contribute to the general improvement of the property.

Considering the purchase price, taxes, insurance, utilities, materials, maintenance, upkeep and improvements, the court finds the total investment and expense to be $281,458 of which Lyman contributed $86,631 (30.8%) and Huber $194,827 (69.2%).

## B. Waste and Trespass

The plaintiff premises these claims on the defendant's conduct to the extent that she lost the quiet use and enjoyment of her home, was prevented from making improvements that would have increased the value, was driven from the property and lost income and her horses because she was forced to abandon her horse related activities.

Although Huber's conduct may have impeded renovations and improvements, there is no evidence that he caused any damage that diminished the value of the property. The court is not aware of any statute or case law in Maine that supports this claim absent evidence of damage or destruction.

Huber, as an equal owner, has an unquestionable right to use and be present on the premises, "trespass cannot be maintained by a tenant in common against his co-tenant." *Maddox v. Goddard*, 51 Me. 14 (1862).

The court finds for the defendant on the claims for waste and trespass.

## C. Ouster

The court agrees with the defendant that ouster is not recognized as an independent tort in Maine; however, the court has found that the plaintiff was driven from the property and forced to give up her horse business and that she never had the opportunity to build it into an on-going enterprise. The defendant's egregious conduct

was the sole cause of her leaving; thus, the root of this claim are the same intentional actions that caused her emotional distress, the result is similar to a loss of business opportunity or earning capacity.

The court finds her damages to be the difference of what she could have reasonably expected to make with the horse business on Two Lights Road and what she earned elsewhere, less what she did earn. Further, the underlying cause of her quick exit from the property was the defendant's conduct. The last minute "fire sale" of the horses was resulted in a loss to her; however, even though she chose to "place" a horse, it had to have some sale value, even if reduced under the circumstances.

Plaintiff's claim for $51,250 for rental value is unfounded.

## D. Intentional Infliction of Emotional Distress

To prevail on an intentional infliction of emotional distress claim, a plaintiff must show that the defendant's behavior was "extreme and outrageous" to the point that it "exceed[s] all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community." *Latremore v. Latremore*, 584 A.2d 626, 630 (quoting *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979) (internal quotation marks omitted). For instance, in *Latremore*, the Law Court upheld a jury verdict awarding damages for emotional distress to a couple whose son had threatened to evict them from property that they originally had sold to him. *Id.* at 630. The Court was persuaded that the jury reasonably could have found the son's behavior was "extreme and outrageous" because he demanded excessively high rent from his parents and threatened to evict them "even though he knew that his parents were aged and . . . in poor health." *Id.*

Lyman contends that shortly after the purchase of the home, Huber began to create and enforce irrational rules and would respond with violent outbursts designed

to control and intimidate her when she did not comply, although she admits that he was never physically violent toward her. She also asserts that she was forced to live in unreasonable conditions, because Huber accumulated piles of papers, boxes, newspapers, periodicals, crates, and trash that Lyman was forbidden to discard, move or even touch. As a result of Huber's actions toward her, she felt inadequate and withdrawn. Visitors to the property witnessed Huber's behavior and support her allegations, including the effect of Huber's behavior on her. They describe Lyman as "guarded, jumpy and withdrawn," "shaken," and "tense, afraid and on edge." Lyman believed that Huber's angry outbursts would lead to violence if she did not comply with his demands, and one friend witnessed her looking "exhausted and stressed with dark circles under her eyes." Finally, she asserts that Huber exploited her financial vulnerability.

Huber claims that the house was messy only toward the end of their relationship as a normal consequence of the "dislocation" that they were experiencing. He denies that any angry outbursts from Huber were directed at Lyman, and points to her deposition testimony where she states that the anger was mostly directed at himself. Furthermore, he argues that Lyman has failed to show that any distress she suffered was sufficiently severe. He asserts that Lyman has not alleged any specific emotional injury or symptom and has not sought treatment for emotional distress. While it is necessary to prove that the defendant's conduct caused severe emotional distress, such distress may at times be inferred from the defendant's conduct and "objective symptomatology is not an absolute prerequisite for recovery of damages for intentional, as opposed to negligent, infliction of emotional distress." *Latremore*, 584 A.2d at 633. Furthermore, the severity of emotional distress that a person suffers is a factual issue. *Id.* at 631. Its manifestation can vary substantially for person to person.

The court finds that Lyman has satisfied her burden on her claim for intentional infliction of emotional distress. The court finds that Huber's behavior toward Lyman constituted a pattern of cruelty and intimidation over a prolonged period so that the court can only conclude that it is extreme and outrageous. Testimony by friends, family and business associates establish that the impact of that conduct upon the plaintiff was severe. The court finds that Huber's behavior was, in fact, bizarre and escalated over time so that it eventually became extreme and outrageous, if not for any particular incident, certainly for his cumulative conduct. Lyman has proven that she did suffer severe emotional distress. There is no particular date on which the court can find the onset of severe emotional distress, but there is n that over a period of more than several years and is entitled to damages.

## E. Punitive Damages

A plaintiff is entitled to punitive damages only if there is underlying "tortious conduct" and "the tortfeasor acted with malice." *Waxler v. Waxler*, 1997 ME 190, ¶ 15, 699 A.2d 1161, 1165. Malice may be found where "the plaintiff can establish by clear and convincing evidence that the defendant's conduct was motivated by actual ill will or was so outrageous that malice is implied." *Id.* (quoting *Fine Line, Inc. v. Blake*, 677 A.2d 1061, 1065 (Me. 1996)).

Although the court finds that the defendant's conduct was tortuous, and at times strange, it does not find by clear and convincing evidence that it was malicious or directed at Lyman so that malice can be implied; thus, an award of punitive damages is not made.

## IV. FINDINGS, DECISION AND JUDGMENT

The clerk will make the following entries as the Findings, Decision and Judgment of the court:

## A. Equitable Partition.

1. The real estate at 150 Two Lights Road, Cape Elizabeth is awarded to plaintiff Elizabeth E. Lyman, on condition that she pays to defendant the sum of $134,327 within 120 days.

2. If the plaintiff does not make payment to defendant as stated above, or prior to 120 days she states that she does not wish to purchase the property, it is ordered that the property be listed for sale with a licensed realtor who is active within the Town of Cape Elizabeth and that the net proceeds of the sale be divided 30.8% to plaintiff and 69.2% to defendant.

3. If the parties cannot mutually agree on the selection of a realtor, the court will appoint a person for the purpose of listing and selling the property.

4. The parties, with the advice and consent of the realtor shall agree upon a listing price for the property. If the parties do not agree, the price set by the realtor with the consent of one of the parties shall govern

5. Unless the parties agree otherwise, the property shall be sold to the first party who offers to purchase the property for a sum that is not less than 90% of the listing price.

B. On plaintiff's claims for waste and/or trespass, judgment is entered for defendant Luke Huber.

C. On plaintiff's claims for ouster, judgment is entered for plaintiff in the amount of $ 31,000.

D. On plaintiff's claims for intentional infliction of emotional distress, judgment is entered for plaintiff in the amount of $ 75,000.

E. On plaintiff's claim for punitive damages, judgment is entered for defendant Luke Huber.

F. Plaintiff is awarded costs as permitted by statute and rule plus statutory interest on damages as found in section C and D above.

SO ORDERED.

Dated: July 23, 2009

Thomas E. Delahanty II
Justice, Superior Court

ELIZABETH LYMAN VS LUKE D HUBER
UTN:AOCSsr  -2006-0090167                    CASE #:PORSC-RE-2006-00145
------------------------------------------------------------------------
SEL VD                              REPRESENTATION TYPE      DATE
01 0000003964 ATTORNEY:HOUSE, PAULA J
ADDR:26 SAWYER STREET SCARBOROUGH ME 04074
     F FOR:ELIZABETH  E LYMAN                 .   PL        RTND   08/10/2006


02 0000003895 ATTORNEY:NORTON, TIMOTHY
ADDR:53 EXCHANGE ST PO BOX 597 PORTLAND ME 04112-0597
     F FOR:LUKE D HUBER                           DEF       RTND   08/11/2006




          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:

Select the EXIT KEY for page selection line.